In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1631

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL 150, AFL-CIO,

*Plaintiff-Appellant,*

*v.*

JOSEPH P. WARD,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 00142—**Ruben Castillo**, *Judge.*

ARGUED OCTOBER 27, 2008—DECIDED APRIL 16, 2009

Before KANNE, WILLIAMS, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* In early 2007, the appellant, International Union of Operating Engineers, Local 150, AFL-CIO, filed a two-count complaint against one of its former officers, the appellee, Joseph P. Ward, in the Northern District of Illinois. Count I of the complaint alleged violations of § 501 of the Labor-Management and Reporting Disclosure Act of 1959 (LMRDA), 29 U.S.C.

§ 501, which establishes fiduciary duties owed by a labor organization's officers to the organization and its members. Following the close of discovery, the district court granted Ward's motion to dismiss the Union's § 501 claim for lack of subject-matter jurisdiction. The district court determined that § 501 did not provide the labor organization, as an entity, with a federal cause of action against its officers for alleged violations of the duties set forth therein. Local 150 appeals this decision. For the reasons that follow, we conclude that § 501 does contain an implied cause of action for a labor organization to sue its officers for breaches of their fiduciary duties. We reverse the decision of the district court and remand for further proceedings.

## I. BACKGROUND

The plaintiff, Local 150, is a labor organization that represents approximately 22,000 employees in Illinois, Indiana, and Iowa. Defendant Joseph Ward served as the treasurer of Local 150 from the time the organization elected him to that position in 1986 until his resignation in 2007.

In its complaint, Local 150 accused Ward of purchasing a piece of real estate that Ward knew Local 150 was interested in purchasing for itself. The property in question was an empty parcel located adjacent to Local 150's District 2 offices in Joliet, Illinois. In 1994, the seller of the property contacted Local 150's president, Bill Dugan, who confirmed the Union's interest in purchasing the property. Dugan gave Ward the responsibility of monitoring the

situation. Local 150 alleged that soon thereafter Ward told the seller that the Union was no longer interested in purchasing the parcel and falsely informed Dugan that the property had been sold to a third party. In fact, however, the property was not sold until several months later, when an investment group that included Joe Ward as a member purchased it for approximately $75,000. Ward's investment group sold the same property in 2003 for $885,000, netting a handsome profit for its constituents.

In January 2007, Local 150 named Joe Ward as the sole defendant in a two-count complaint filed in the United States District Court for the Northern District of Illinois. Count I of the complaint sought damages for alleged violations of § 501 of the LMRDA, which codifies the fiduciary duties that a labor organization's officers owe to the organization and its membership. Count II alleged similar breaches of fiduciary duties under Illinois state law.

Ward filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), which the district court granted on February 14, 2008. The district court concluded that § 501 does not contain a private cause of action for labor unions to bring claims under the LMRDA in federal court, rendering the district court without subject-matter jurisdiction to hear the dispute. The court dismissed the Union's federal claim with preju-dice. In so doing, the district court, in its discretion, also refused to exercise supplemental jurisdiction over the state law claim, dismissing it without prejudice. Local 150 now appeals the district court's decision that it lacked subject-matter jurisdiction to hear the Union's federal claim.

## II. ANALYSIS

We review *de novo* whether a district court properly dismissed a case for lack of subject-matter jurisdiction. *Peters v. Vill. of Clifton*, 498 F.3d 727, 729-30 (7th Cir. 2007). We begin our analysis with a brief examination of the contents and history of the LMRDA. We then discuss the limited nature of federal courts' jurisdiction and the general prerequisite to that jurisdiction of a federal cause of action. With that context, we finally turn our attention to the decisive question in this case: whether § 501 of the Act creates a private cause of action for labor organizations to sue in federal court for alleged violations of the duties it establishes. We conclude that it does.

### A. The Labor-Management and Reporting Disclosure Act of 1959

In 1959, Congress passed the LMRDA, also known as the Landrum-Griffin Act, Pub. L. No. 86-257, 73 Stat. 519 (codified as amended at 29 U.S.C. § 401 *et seq.*), in response to growing concerns over corruption, violence, and racketeering within the leadership of labor organizations across the country, *see Hood v. Journeymen Barbers, Hairdressers, Cosmetologists & Proprietors Int'l Union*, 454 F.2d 1347, 1354 (7th Cir. 1972); *Phillips v. Osborne*, 403 F.2d 826, 828 (9th Cir. 1968). A year earlier, a congressional committee known as the Select Committee on Improper Activities in the Labor Management Field released a report, popularly referred to as the McClellan Committee

Report, detailing these problems. *See* S. Rep. No. 85-1417 (1958); *see also Phillips*, 403 F.2d at 828. This report served as the catalyst that prompted Congress to promulgate the LMRDA. *See Hood*, 454 F.2d at 1354 ("[Section 501] was a direct and far-reaching response to the mischief exposed and dramatized by the McClellan Committee. That mischief was the misuse of union funds and property by union officials in its every manifestation."). This case focuses on the first two subsections of § 501 of the Act.

Subsection (a) imposes many fiduciary duties on a labor organization's "officers, agents, shop stewards, and other representatives."[1] 29 U.S.C. § 501(a).[2] Specifically, the

---

[1] Throughout this opinion, we will refer to these various organizational representatives under the collective term of "officers."

[2] The text of 29 U.S.C. § 501(a) reads as follows:

The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and bylaws and any resolutions of the governing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or

(continued...)

Act requires those individuals, all of whom "occupy positions of trust in relation to such organization and its members as a group," to hold and manage the union's money for the sole benefit of the organization, to refrain from self-dealing, and to remain loyal to the organization. *Id.* The statute makes it clear that these duties inure to the benefit of the labor organization and the people it represents as a body, not to the members as individuals. *Id.*

The duty of loyalty is at the forefront of this case. The Act states that a covered individual shall "refrain from dealing with [the] organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization." *Id.* If a union officer engages in such conduct, the Act requires him to account to the organization for any resulting profits he received. *Id.*

If an officer commits violations of the fiduciary duties set forth in subsection (a), subsection (b) creates a federal

---

[2] (...continued)

acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy.

cause of action for individual union members to sue and "recover damages . . . *for the benefit of the labor organization.*" *Id.* § 501(b) (emphasis added).[3] Because these member suits serve to benefit the union, they are derivative, much like shareholder derivative suits brought on behalf of corporations. *See Hoffman v. Kramer*, 362 F.3d 308, 317 n.4 (5th Cir. 2004)*; Chathas v. Local 134 IBEW*, 233 F.3d 508, 514 (7th Cir. 2000); *O'Hara v. Teamsters Union Local No. 856*, 151 F.3d 1152, 1161 (9th Cir. 1998). As with shareholder derivative suits, the Act permits a union member to file such a suit only if he first takes prescribed steps. *See Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers v. Statham*, 97 F.3d 1416, 1419 (11th Cir. 1996) (comparing the prerequisites for claims brought under

---

[3] The relevant text of 29 U.S.C. § 501(b) reads as follows:

When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization. No such proceeding shall be brought except upon leave of the court obtained upon verified application and for good cause shown, which application may be made ex parte. . . .

§ 501(b) to those required for shareholder derivative suits). First, the union member must request, and the union must refuse, that the union take appropriate action to censure its own officer. *Hoffman*, 362 F.3d at 313-14; *see also* 29 U.S.C. § 501(b). Second, if the union refuses to take action, the union member must then show good cause for the suit and receive the court's permission to bring the action. *Hoffman*, 362 F.3d at 314; *see also* 29 U.S.C. § 501(b). This allows the court to assess the member's claim and ensure that the member seeks the type of remedy that would ultimately benefit the union. *See Hoffman*, 362 F.3d at 319.

The statute, therefore, openly declares that union members may sue in federal court for violations of the duties that it establishes. The Act is silent, however, on whether it creates a similar federal cause of action for unions. As we discuss below, in this context such a cause of action is a prerequisite for a union to proceed in federal court.

B.  *The Cause of Action Component of Federal Question Jurisdiction*

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Newell Operating Co. v. Int'l Union of United Auto., Aerospace & Agric. Implement Workers*, 532 F.3d 583, 587 (7th Cir. 2008). The circumscribed nature of the federal judiciary's jurisdiction is a function of restrictions placed upon it by both the United States Constitution and federal statutory

law, both of which must authorize a federal court to hear a given type of case. *See Kokkonen*, 511 U.S. at 377; *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986).

The Constitution permits federal courts to hear only certain claims, including those claims between parties of diverse state citizenship and, most importantly for present purposes, "federal question" claims, or those "arising under" the laws of the United States. U.S. Const. art. III, § 2, cl. 1. This constitutional grant of judicial authority is broad. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 495 (1983); *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738, 823 (1824).

Despite this broad grant of authority, the Constitution gives Congress the power to further refine the actual scope of federal jurisdiction.[4] *See* U.S. Const. art. I, § 8, cl. 9 (granting Congress the power "[t]o constitute tribunals inferior to the Supreme Court"); *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982) ("Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction."). In so doing, however, Congress may not exceed its constitutional authority. *See Verlinden*

---

[4] Only the jurisdiction of the Supreme Court of the United States is self-executing. *California v. Arizona*, 440 U.S. 59, 65 (1979) ("The original jurisdiction of the Supreme Court is conferred not by the Congress but by the Constitution itself. This jurisdiction is self-executing, and needs no legislative implementation.").

*B.V.*, 461 U.S. at 491 ("Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution."); *Marquette Cement Mfg. Co. v. FTC*, 147 F.2d 589, 593 (7th Cir. 1945) ("There are no limitations upon this congressional power [to grant jurisdiction to the federal courts] other than the Constitution."). In this way, the Constitution imposes a ceiling, albeit a high one, on the potential jurisdiction of the federal courts.

As we will discuss, Congress, by means of statutory grant, uses its constitutional authority to more narrowly restrict the federal courts' subject-matter jurisdiction. *Ins. Corp. of Ir.*, 456 U.S. at 701; *Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm. v. Troha*, 328 F.3d 325, 327 (7th Cir. 2003) ("Federal courts . . . may only exercise jurisdiction where it is specifically authorized by federal statute."); *Marquette Cement Mfg. Co.*, 147 F.2d at 593 ("The jurisdiction and authority of [the federal courts] is confined solely to that which Congress bestows."). This allows Congress to exercise significant control over the types of cases federal courts may hear and is one of the many checks and balances built into the three-branch system of American government. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998).

For many years, Congress withheld from federal courts the ability to hear claims based solely on federal law. It was not until 1875, in fact, that Congress furnished federal courts with general federal question jurisdiction. Act of Mar. 3, 1875, ch. 137, 18 Stat. 470. Today, federal question jurisdiction is codified at 28 U.S.C. § 1331, which

states that "[t]he district courts shall have original juris-diction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Although the language of § 1331 is similar to that of Article III, courts have interpreted § 1331 much more narrowly than its constitutional counterpart. *See Verlinden B.V.*, 461 U.S. at 494-95 ("[T]his Court never has held that statutory 'arising under' jurisdiction is identical to Art. III 'arising under' jurisdiction. . . . Art. III 'arising under' jurisdiction is broader than federal-question jurisdiction under § 1331 . . . ."). What "arises under" § 1331 has been the subject of much debate among the courts. *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 8-9 (1983) (discussing the difficulties of interpreting "arising under"). When, however, as here, a case presents a pure federal question, i.e., a claim that alleges only direct violations of federal law, the answer, at least in theory, is fairly straightforward. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) ("This ['arising under'] provision [of 28 U.S.C. § 1331] for federal-question jurisdiction is invoked by and large by plaintiffs pleading a cause of action created by federal law."). For purposes of exercising federal jurisdiction under § 1331, such a claim "arises under" federal law if the law in question creates a federal cause of action. *See Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916); *Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007).

Thus, when the basis of the action is a federal statute, a federal cause of action must exist as well for a federal

court to hear a given claim; the general grant of federal question jurisdiction contained in § 1331, without a federal cause of action, is not enough.[5] *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 456 (1974). As the Supreme Court has said: "[T]he threshold question clearly is whether the [Act] . . . creates a cause of action whereby a private party . . . can enforce duties and obligations imposed by the Act; for it is only if such a right of action exists that we need consider . . . whether the District Court had jurisdiction to entertain it." *Id.* at 456. This appeal calls for us to answer that "threshold question" in the context of § 501.

---

[5]  In certain situations not before us today, a state law cause of action may also raise a federal question sufficient to permit federal court jurisdiction. *See Grable & Sons Metal Prods., Inc.*, 545 U.S. at 312 ("[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."); *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997) (citing *Franchise Tax Bd.*, 463 U.S. at 13); *see, e.g., Smith v. Kan. City Title & Trust Co.*, 255 U.S. 180, 199-202 (1921) (recognizing federal jurisdiction to hear a state law cause of action where "the right to relief depends upon the construction or application of the Constitution or laws of the United States"); *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 817 (1986) (recognizing, albeit narrowing, the continued validity of the *Smith* doctrine before finding no such cause of action in that case). *But see Moore v. Chesapeake & O. Ry. Co.*, 291 U.S. 205, 214-15 (1934) (declining to recognize federal jurisdiction in a situation similar to that in *Smith*).

*C.  Federal Causes of Action Created by § 501 of the LMRDA*

The question before us is whether § 501 creates a private federal cause of action for a labor organization as an entity. Although on appeal the parties couch their arguments only in terms of § 501(b), we are not limited by the parties' arguments regarding questions of jurisdiction. *See Bender*, 475 U.S. at 541; *United States v. County of Cook, Ill.*, 167 F.3d 381, 387 (7th Cir. 1999) ("[N]either the parties nor their lawyers may stipulate to jurisdiction or waive arguments that the court lacks jurisdiction."); *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 179 (7th Cir. 1994). Indeed, we are bound to evaluate our own jurisdiction, as well as the jurisdiction of the court below, *sua sponte* if necessary. *See Bender*, 475 U.S. at 541; *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884); *Craig v. Ontario Corp.*, 543 F.3d 872, 875 (7th Cir. 2008). If we determine that § 501 creates a federal cause of action for unions to sue, the district court will have erred in dismissing the Union's claim; just as the law requires a court to refrain from hearing a case over which it lacks jurisdiction, it also obligates a court to hear any case for which a proper jurisdictional basis does exist. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 358 (1989) ("[F]ederal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred. . . . 'We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution.'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821))).

Federal causes of action may be created either expressly or by implication. *See Transamerica Mortgage Advisors, Inc. v. Lewis* (*TAMA*), 444 U.S. 11, 15 (1979). Whether express or implied, however, we remain mindful that it is Congress, not this or any other court, that creates private causes of action to enforce federal law. *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."). Thus, as we discuss in detail below, we must determine whether Congress *intended* the statute in question to create, either expressly or by implication, such a cause of action. *See id.* at 286 (calling statutory intent "determinative"); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted . . . ."). The question, then, becomes one of statutory construction. *Touche Ross & Co.*, 442 U.S. at 568; *Cannon v. Univ. of Chi.*, 441 U.S. 677, 688 (1979). As with any such question, we turn as our starting point to the language of § 501 itself, *see Touche Ross & Co.*, 442 U.S. at 568, and ask whether it evinces Congress's intent to create, expressly or impliedly, a private cause of action for labor organizations to enforce its provisions.

### 1. *Express Federal Cause of Action*

Congressional intent is unmistakably evident in the case of an express cause of action. An express federal

cause of action states, in so many words, that the law permits a claimant to bring a claim in federal court. Section 501(b) of the LMRDA, which expressly authorizes members of a labor union to bring a claim for violations of § 501(a) "in any district court of the United States," opens to these members the doors of the federal court system. Congress's intent is unequivocal, establishing § 501(b) as a clear example of an express federal cause of action.

A plain reading of both subsections (a) and (b) of § 501 makes it equally clear that neither provision contains an express federal cause of action for a labor organization. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 374 n.16 (1990). Both circuit courts to have considered the issue have reached this same conclusion. *See Statham*, 97 F.3d at 1419; *Bldg. Material & Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500, 506-07 (9th Cir. 1989). The absence of an express cause of action does not end our inquiry, however. We next ask whether the statute creates an implied federal cause of action.

### 2. Implied Federal Cause of Action

District and circuit courts alike are divided on whether § 501 creates an implied federal cause of action for labor organizations.[6] Although the Supreme Court has recog

---

[6] For examples of decisions implying such a cause of action, see *Statham*, 97 F.3d at 1421; *Int'l Longshoremen's Ass'n, Steamship Clerks Local 1624 v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335,

(continued...)

nized the difficulty of interpreting § 501, it has thus far declined to resolve the issue. *See Guidry*, 493 U.S. at 374 n.16 ("Courts have reached inconsistent positions on the question whether a union may bring suit under § 501. We need not resolve that question here." (citations omitted)).

Only two circuit courts, the Ninth and Eleventh Circuits, have addressed the question, and they have reached opposite conclusions. In *Traweek*, the Ninth Circuit, focusing exclusively on § 501(b), declined to recognize an implied federal cause of action for suits by labor unions. 867 F.2d at 506-07. The court based its conclusion on four grounds. First, the court focused on the plain language of subsection (b), stating that "[t]he clear language of the statute does not contemplate a suit brought by a union." *Id.* at 506. Second, the court claimed adherence to "the federal policy of noninterference in the internal affairs of unions and labor matters." *Id.* Third, the court believed its decision to be consistent with "the general

---

[6] (...continued)
1339 (E.D. Va. 1996); *Operative Plasterers & Cement Masons Int'l Ass'n v. Benjamin*, 776 F. Supp. 1360, 1365 (N.D. Ind. 1991); and *Glenn v. Mason*, No. 79 Civ. 3918, 1980 WL 140904, at *1-2 (S.D.N.Y. Aug. 18, 1980). Decisions reaching the opposite conclusion include, for example, *Traweek*, 867 F.2d at 507; *Local 443, Int'l Bhd. of Teamsters v. Pisano*, 753 F. Supp. 434, 436 (D. Conn. 1991); *Int'l Bhd. of Boilermakers v. Freeman*, 683 F. Supp. 1190, 1192 n.3, 1193 (N.D. Ill. 1988); and *Local 624, Int'l Union of Operating Eng'rs v. Byrd*, 659 F. Supp. 274, 276 (S.D. Miss. 1986).

principle . . . that the scope of federal jurisdictional statutes should be construed narrowly." *Id.* at 507. And fourth, the Ninth Circuit found evidence of Congress's intent to grant the remedy solely to the union members in § 501(b)'s requirement that union members request leave of the court before suing. *Id.* at 506.

The Eleventh Circuit viewed the statute differently. In *Statham*, the court read subsections (a) and (b) of § 501 together and concluded that the statute as a whole created an implied federal cause of action for labor organizations. 97 F.3d at 1421. Relying on the Act's plain language and its legislative history, the court found that Congress intended labor organizations to have access to the federal courts for suits to enforce the fiduciary duties imposed by § 501(a). *See id.* at 1421 ("We conclude that *section 501(a)* was intended to create a federal cause of action that can be asserted by the union on its own behalf." (emphasis added)).

In looking to the duty-creating language of § 501(a), the Eleventh Circuit said that "[i]t would make no sense to impose federal duties and simultaneously deny the unions the right to enforce those duties." *Id.* at 1420. The court hypothesized that "[i]f Congress had only enacted section 501(a) without section 501(b), no one would suggest that Congress meant to deny the union the right to enforce 501(a)." *Id.* The court saw no reason that subsection (b)'s mere existence should detract from what it viewed as the obvious import of subsection (a). *See id.* at 1421 ("We should not infer from the mention of individual suits that Congress did not intend to give unions a cause of action.").

Instead, the Eleventh Circuit read subsection (b) as a complement to subsection (a). Subsection (b), the court noted, had two purposes. The first was to enable individual union members to sue on the union's behalf. *Id.* The second was "to make sure that individuals do not preempt a union's right to prosecute its own claims." *Id.* Despite these dual purposes, the court noted that § 501(b) itself, which requires that unions have the first opportunity to sue for violations of the duties set forth in subsection (a), "makes the first purpose subservient to the second." *Id.*; *see also id.* at 1419 ("[S]ection 501(b) shows Congress preferred that the union, rather than individual members, sue on its own behalf."). The Eleventh Circuit summarized the interplay between subsections (a) and (b) as follows: "It is far more in keeping with the statute as a whole to conclude that, having given the unions certain rights, Congress thought it implicit that the unions could enforce those rights in court. Allowing the individuals to assert the unions' claims was more extraordinary and therefore had to be spelled out." *Id.* at 1421.

The Eleventh Circuit also looked to the LMRDA's legislative history for evidence of Congress's intent. The court noted that the Act was a broad and wide-ranging attempt to reign in corruption within union leadership. *Id.* at 1420-21 (citing *Hood*, 454 F.2d at 1354). When Congress passed the LMRDA, few states had imposed fiduciary duties upon union officials, and members of Congress perceived the remedies available for breaches of those duties to be inadequate. *Id.* at 1420 (citing S. Rep. No. 86-187 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2318, 2376). The

court concluded from this historical background that "Congress intended to supplement the remedies available to unions by creating new federal protections." *Id*. Because § 501 was intended to compensate for inadequate state remedies, the court held that it would "frustrate congressional intent to relegate the union to state remedies." *Id.*

It is incumbent on this court, it appears, to break the tie between the Ninth and Eleventh Circuits on this issue. We begin with the Supreme Court's current views on implied private federal causes of action. The Court's guidance on when a court should recognize an implied cause of action has evolved over time. Originally, the Court would find an implicit cause of action if doing so would effectuate a statute's purpose and there was nothing in its legislative history to counter the implication. *See J.I. Case Co. v. Borak*, 377 U.S. 426, 431-35 (1964). The Court later adopted a series of questions to help courts decide whether to imply a federal cause of action. *See Cort v. Ash*, 422 U.S. 66, 78 (1975). The four factors the Court considered were (1) whether the statute created a federal right in favor of the plaintiff; (2) whether there existed explicit or implicit evidence of congressional intent either to create or deny a cause of action; (3) whether implying a cause of action was consistent with the underlying purpose of the legislative scheme; and (4) whether the cause of action was one traditionally relegated to the states. *Id.*

Most recently, however, the Court has distanced itself from the approaches discussed in both *Borak* and *Cort*. *See*

*Alexander*, 532 U.S. at 287; *TAMA*, 444 U.S. at 15-16; *see also Thompson v. Thompson*, 484 U.S. 174, 189 (1988) (Scalia, J., concurring in the judgment) (calling *Cort* "effectively overruled"). Instead, as we have noted, the Court has now focused solely on the question of congressional intent. *See Alexander*, 532 U.S. at 286-87; *Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 532-33 (1989) (looking at congressional intent as the sole factor in its implied-cause-of-action analysis); *TAMA*, 444 U.S. at 15-16; *Touche Ross & Co.*, 442 U.S. at 568; *see also Thompson*, 484 U.S. at 189 (Scalia, J., concurring in the judgment) (referring to congressional intent as "the determinative factor" in evaluating the existence of a private cause of action).

In *Alexander*, 532 U.S. 275, the Court, while interpreting a section of Title VI of the Civil Rights Act, attempted to bring some clarity to the implied cause of action analysis. Justice Scalia, writing for the Court, said: "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* at 286. The inquiry into congressional intent, therefore, is two-fold: Congress must have intended to create both a private right and a private remedy. *Id.* Such is the inquiry that we now must undertake in the context of § 501.

We begin with the text of the statute. *Touche Ross & Co.*, 442 U.S. at 568. As required by *Alexander,* we look specifically for "rights-creating language" and an enforcement regime suggesting the existence of a private remedy for labor organizations. 532 U.S. at 288-89. Subsection

(a) provides that union officers, agents, and other represen-
tatives "occupy positions of trust in relation to *such
organization and its members as a group*." 29 U.S.C. § 501(a)
(emphasis added). This language establishes union
officers as fiduciaries vis-à-vis the union and its mem-
bers. Had the statute stopped there, one might argue
that the text suggests an intent to leave the scope of the
fiduciary relationship to state common law and remit
unions to standard state-law fiduciary remedies.

But § 501(a) goes further. It articulates a series of specific
fiduciary duties. Union officers must hold the union's
money and property "solely for the benefit of the organiza-
tion and its members." *Id.* They must "refrain from
dealing with such organization as an adverse party or in
behalf of an adverse party." *Id.* They must not "hold[]
or acquir[e] any pecuniary or personal interest which
conflicts with the interests of such organization." *Id.* And
they must "account to the organization for any profit
received by him . . . in connection with transactions
conducted by him or under his direction on behalf of the
organization." *Id.* Finally, the last sentence of § 501(a)
provides that "[a] general exculpatory provision in the
constitution and bylaws of such a labor organization or
a general exculpatory resolution of a governing body
purporting to relieve any such person of liability for
breach of the duties declared by this section shall be
void as against public policy." *Id.*

This language does not simply stipulate that general
state-law fiduciary principles apply. Instead, it prescribes
in some detail the scope of the fiduciary relationship

between union officers and the union. The statutory text imposes a series of explicit, affirmative fiduciary obligations and requires an accounting "to the organization" for profits received by union officers in the course of the union's operations. The itemized list includes some traditional duties of a fiduciary, but the fact that they are specifically enumerated suggests the imposition of new *federal* duties plainly inuring to the benefit of the union and its members. That much is clear from the statutory text (union officers "occupy positions of trust *in relation to such organization and its members as a group*," hold money and property "solely *for the benefit of the organization and its members*," and must "account *to the organization* for any profit"). *Id.* (emphases added). But it also flows from the nature of a fiduciary duty. A statute that imposes fiduciary *duties* necessarily implies corresponding *rights* in the beneficiaries. The statute's focus is thus not solely on the persons being regulated but also on those whose interests are protected—here, the union and, by extension, its members. *Cf. Alexander*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." (quotations omitted)).

Thus, an implication arises that § 501(a) confers federal rights on labor organizations: the right to the faithful performance by union officers of the general and specific fiduciary obligations enumerated in the text; the right to an accounting; and the right to nullify any exculpatory clause asserted by union officers as a defense to an action for liability for breach of the fiduciary duties

imposed by § 501(a). In other words, the statutory language as a whole manifests an intent "to create new rights" for labor unions. *See Alexander*, 532 U.S. at 289.

The statutory language implies the creation of a federal remedy for the union as well. The statutory duty to "account to the organization for any profit received" fairly implies that the union has a specific remedy—that it may sue an unfaithful officer in federal court for an accounting for ill-gotten gains. The last sentence in § 501(a) also suggests the existence of a federal enforcement regime that includes a remedy for the union. It voids any exculpatory provision in the union's organizational documents or resolutions that "purport[s] to relieve any [union officer] of liability for breach of the duties" declared in the statute. 29 U.S.C. § 501(a). The only possible role such an exculpatory clause could serve is as a defense to a claim against a union officer for breach of the duties imposed by § 501(a), and any such claim belongs *at least* to the union.[7] By nullifying any exculpatory provisions, the statute removes a possible *defense* to liability. It follows that the union must have a statutory remedy for liability for breach against which this sort of defense might potentially be asserted.

The derivative action created in subsection (b) for individual union members reinforces rather than undermines the implication arising from the text of subsection

---

[7] We defer momentarily the question of the remedies available to individual union members, which the statute addresses in subsection (b).

(a).[8] Section 501(b), by its terms, does nothing more than grant union members the right to sue on a union's behalf. It was necessary for Congress to make this derivative cause of action explicit because there is nothing in subsection (a) to suggest that union members themselves could sue for fiduciary violations committed against the union. *See Statham*, 97 F.3d at 1421 ("Allowing the individuals to assert the unions' claims was more extraordinary and therefore had to be spelled out."). In creating this express cause of action for union members, however, § 501(b) neither opens nor closes the federal courthouse to the unions themselves. Instead, it provides further evidence that labor organizations have an implied cause of action under subsection (a).

Subsection (b) conditions union members' right to sue on the union's refusal or failure to bring suit itself. *See* 29 U.S.C. § 501(b). Only after union members have requested that the union seek relief for violations of § 501(a), and the union has failed or refused to take such action, may the union member sue. *Id.* The union member's suit may "recover damages or secure an accounting or other appropriate relief *for the benefit of the labor organization.*" *Id.* (emphasis added). By structuring the union member's right and remedy in this way, Congress has created a derivative system much like share-

---

[8] The Ninth Circuit in *Traweek* held that § 501(b)'s express cause of action for individual union members foreclosed any implied cause of action for the union itself. *See* 867 F.2d at 506-07. We disagree, for the reasons we explain.

holder derivative actions seen in corporate law. *See Hoffman*, 362 F.3d at 317 n.4; *Chathas*, 233 F.3d at 514; *see also* Fed. R. Civ. P. 23.1.

We pause here to note that in reordering the analysis in private-cause-of-action cases, *Alexander* subordinated context to text, but it did not eliminate consideration of legal context entirely, particularly when used to clarify text. *See Alexander*, 532 U.S. at 288 ("We have never accorded dispositive weight to context shorn of text. In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text." (citation omitted)). Here, there are important parallels between union member derivative actions under § 501(b) and shareholder derivative suits; to the extent that the text of § 501 requires clarification, we find it in this legal context.

At common law and under modern state corporation law statutes, the derivative action remedy allows shareholders to bring a corporation's claim on the corporation's behalf when the corporation fails or refuses to act. *See Ross v. Bernhard*, 396 U.S. 531, 534 (1970). In *Ross*, the Supreme Court discussed the history of shareholder derivative actions. The Court noted that courts in equity developed the derivative suit to provide shareholders redress "against faithless officers and directors [and] also against third parties who had damaged or threatened the corporate properties." *Id.* The American legal system, said the Court, viewed a shareholder derivative action "as a suit to enforce *a corporate cause of action* against officers, directors, and third parties." *Id.* (emphasis added);

*see also Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522 (1947) ("The cause of action which such a [derivative] plaintiff brings before the court is not his own but the corporation's."). The Court went on to say that "one precondition for the [shareholder] suit was a valid claim *on which the corporation could have sued.*" *Ross*, 396 U.S. at 534 (emphasis added).

The same principles are at work in the federal derivative remedy created for union members in § 501(b). The statutory rights conferred by subsection (a) belong to the union; individual union members are derivative beneficiaries, and under subsection (b) they may sue in federal court on the union's behalf to vindicate those rights, but only if the union itself first fails or refuses to do so. It would be anomalous indeed to read this statutory scheme as remitting the union's own suit—which is primary under the statutory hierarchy—to state court. *See TAMA,* 444 U.S. at 19 & n.8 (interpreting 15 U.S.C. § 80b-15 as implying a limited private cause of action for violation of the Investment Advisers Act and noting that Congress could have intended that claims under § 215 would be brought only in state court, but declining "to adopt such an anomalous construction without some indication that Congress in fact wished to remit the litigation of a federal right to state court"); *see also Statham*, 97 F.3d at 1420. A district court in this circuit has also recognized this irregularity: "To allow union members to sue in federal court while foreclosing suit by unions would create perverse incentives whereby unions would 'refuse' to bring suit upon an appropriate demand by one of its members for the sole purpose of manufacturing federal jurisdiction." *Benjamin*, 776 F. Supp. at 1366.

As our discussion makes clear, we agree with the Eleventh Circuit that the text and remedial structure of § 501(a) and (b), read together, imply both federal rights and a federal remedy for labor organizations against union officers who violate their statutory duties.[9] Today's conclusion does not extend our jurisdiction beyond that contemplated by Congress, as some courts have suggested. *See, e.g.*, *Traweek*, 867 F.2d at 506-07; *Freeman*, 683 F. Supp. at 1192. We may not, nor have we any desire to, enlarge our own jurisdiction. Instead, today's decision arises by clear implication from the text, structure, and context of § 501.

Nor do we believe, as the Ninth Circuit has stated, that this conclusion represents an unwarranted interference in the internal affairs of labor organizations. *See Traweek*, 867 F.2d at 506; *Phillips*, 403 F.2d at 830. Congress has weighed the risks and benefits of a federal judicial remedy for the misconduct of union officers; we are bound to give effect to the LMRDA as written, with the interpretive guidance we have drawn from the Supreme Court's recent implied-cause-of-action jurisprudence.

In summary, we hold that labor organizations have an implied cause of action under § 501(a) to sue in federal court for violation of the fiduciary duties imposed by the statute. The text and structure of the statute as a whole demonstrate Congress's intent to confer upon unions

---

[9] We part company, however, with the Eleventh Circuit's use in *Statham* of the LMRDA's legislative history. *See* 97 F.3d at 1420.

federal rights and a federal remedy. Because Local 150 has a federal cause of action for violation of § 501, the district court possessed jurisdiction to hear this case pursuant to the general grant of federal-question jurisdiction, 28 U.S.C. § 1331, and therefore erred in dismissing the suit.

### III.  CONCLUSION

For the reasons above, we conclude that the district court incorrectly dismissed the case for lack of subject-matter jurisdiction. We REVERSE the decision of the district court and REMAND the case for further proceedings.